MARIO E. DÁVILA y EDUARDO FLORES, peticionarios, *v.* SECRETARIO DE ESTADO DE PUERTO RICO, demandado.

Número 520.

*Sometido:* 3 de agosto de 1960. *Resuelto:* 4 de agosto de 1960.

*Francisco Ponsa Feliú* y *Alvaro R. Calderón Jr.*, abogado de los peticionarios; *J. B. Fernández Badillo, Procurador General* y *Arturo Estrella, Subprocurador General,* abogados del demandado.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En esta solicitud de Mandamus radicada en julio 22 de 1960 comparecieron los peticionarios Mario E. Dávila y

Eduardo Flores como demandantes, alegando ser organizadores y Presidente y Secretario provisionales, respectivamente, del Partido Acción Cristiana que estaba en trámites de inscripción para las elecciones que fueron celebradas en 8 de noviembre de 1960. Expusieron que ellos habían tratado de inscribir ciertos precintos electorales, entre ellos el de Culebra, incluyendo entre el número de peticiones juradas un número de peticiones firmadas por electores inscritos en las últimas inscripciones celebradas el 30 y 31 de enero de 1960, electores que no habían votado en las elecciones de 1956, y que el Departamento de Estado les había comunicado que rechazarían y habrían de rechazar todas las peticiones de Inscripción suscritas por electores inscritos en esas fechas que no habían votado en el 1956 por el fundamento de que dichas personas no eran electores capacitados de acuerdo con lo dispuesto en la sección 37 de la Ley Electoral. Alegaron los peticionarios que esta posición asumida por el Secretario de Estado no tenía apoyo o base en disposición legal alguna, siendo una interpretación de la ley injusta, ilegal e irrazonable, ya que la sección 37 de la Ley Electoral dispone que toda persona que firmare una petición para nombrar un candidato para un cargo hará constar que es un elector debidamente inscrito y que está capacitado para votar.

Contestó el Secretario de Estado negando que los demandantes fueran organizadores y Presidente y Secretario provisionales del Partido Acción Cristiana, aunque luego admitió que los testigos de los demandantes declararían que fueron nombrados debidamente como tal, y aceptó que un número de electores inscritos en las últimas inscripciones celebradas el 30 y 31 de enero de 1960 le habían presentado, en algunos precintos, peticiones de candidatos bajo el nombre de Partido Acción Cristiana para la inscripción en los precintos en los que ellos habrían de votar; y aceptó además que su Departamento había hecho saber a los peticionarios que no contaría para los fines de inscripción de candidaturas

las peticiones firmadas por electores inscritos en las inscripciones celebradas en 1960, aunque alegó que en ningún precinto se había denegado "oficialmente" la inscripción de candidatura alguna de dicho Partido. Sostuvo que la interpretación que él daba a las disposiciones de la sección 37 de la Ley Electoral en el sentido de no estar obligado a aceptar peticiones firmadas por electores inscritos ese mismo año era absolutamente razonable y resultaba ser además la única interpretación compatible con el mecanismo electoral creado en las demás disposiciones de la Ley Electoral y de la Ley de Inscripciones.

Por vía de desestimación el Secretario de Estado alegó (*a*) que la acción debía desestimarse por adolecer de defecto fatal de partes; (*b*) la acción pretendía dilucidar una cuestión que resultaba académica en ese momento; y (*c*) que de no existir los defectos señalados en (*a*) y (*b*), la acción era prematura. El Tribunal celebró una vista para oir a las partes y se aportó prueba documental y testifical. En 4 de agosto de 1960 resolvimos el caso dictando la siguiente sentencia:

"A base de la prueba recibida y por las razones que oportunamente se expresarán en una opinión, el Tribunal declara sin lugar la moción de desestimación presentada por el demandado y le ordena al Secretario de Estado que acepte y tome en cuenta en el cómputo requerido para la inscripción del Partido Acción Cristiana las peticiones juradas de inscripción suscritas por electores inscritos los días 30 y 31 de enero de 1960".

El primer fundamento para la desestimación que declaramos sin lugar, levantó la cuestión de que había un defecto fatal de partes. Demandaron Mario E. Dávila y Eduardo Flores como organizadores y Presidente provisionales del Partido Acción Cristiana en trámites de inscripción. La sección 37 de la Ley Electoral, según fue enmendada en 2 de septiembre de 1955,—16 L.P.R.A. Sec. 112,—dispone así en lo pertinente:

"Pueden nombrarse candidatos por petición para cualquier cargo en la forma siguiente:

"Se presentará una petición al Secretario de Estado de Puerto Rico haciendo constar los nombres de los candidatos nombrados en la misma, los sitios de residencia de esos candidatos y los cargos para los cuales son respectivamente nombrados. . . .

"En cada una de dichas peticiones se hará constar el nombre del partido que los peticionarios representan y se designará en la misma una divisa o emblema sencillo, bajo el cual se imprimirá en las papeletas electorales el nombre del candidato de dicho partido; . . .

" . . . No será necesario archivar una declaración jurada separada para cada persona que firmare una petición para su nombramiento, pero cada una de esas peticiones deberá hacer constar claramente los nombres de los candidatos cuyos nombramientos se solicitan por cada peticionario y los cargos para los cuales respectivamente es el deseo del peticionario que sean nombradas dichas personas. . . .

"En los casos en los cuales se nombrare en una petición un candidato o candidatos que hubieren de votarse en más de un precinto o municipio, así como también candidatos para cargos que hubieren de votarse en un solo precinto o municipio no será necesario presentar peticiones por separado para ese candidato o candidatos, sino que los nombres de todos esos candidatos pueden aparecer en una petición para cada precinto o municipio en el distrito en el cual hubieren de votarse dicho candidato o candidatos, y el número total de esos peticionarios en peticiones por precintos o municipios, será contado para el candidato o candidatos para ese distrito, lo cual incluirá un candidato nombrado para el cargo de Gobernador de Puerto Rico".

Se admitió en evidencia, *Exhibit 1* de los demandantes, un formulario impreso titulado "Petición de Inscripción del Partido Acción Cristiana y de sus Candidatos para las Elecciones Generales de 1960 Precinto de Aguas Buenas, Puerto Rico", el cual se estipuló por las partes que era idéntico en su contenido impreso a todos los formularios de peticiones radicadas hasta ese momento en el Departamento de Estado, excepto en cuanto a un número de peticiones en que se había

tachado u omitido la parte del impreso que hace constar que el peticionario votó en las elecciones de 1956.

En lo que a la cuestión que ahora consideramos respecta, en el formulario impreso mencionado el elector peticionario hace constar lo siguiente:

"Yo designo como miembros del Organismo Directivo Central del antes mencionado partido a las siguientes personas: Sr. Mario Dávila, Presidente; Juan Arbona del Valle, Vicepresidente, Sr. Eduardo Flores, Secretario; Sr. Gilberto González Seijo, Tesorero; Srta. Consuelo Delgado, Auditor.

Designo este Organismo Directivo Central como mi representante, para todos los efectos legales según la Ley Electoral de Puerto Rico, autorizándolo para que en mi representación haga todo lo necesario para dirigir dicho partido y para nombrar y comunicar a usted los sustitutos de cualquiera de los candidatos abajo nombrados, en caso de que por renuncia, muerte o cualquier otro motivo, cualquiera de dichos candidatos deje de serlo, y autorizo a dicho Organismo Directivo Central para hacer cualquier cambio o sustitución del nombre o emblema de dicho partido, y para resolver cualquier cuestión relacionada con dicho partido, o con tales candidatos, autorizándolo, también, para representarme ante los organismos y funcionarios del Gobierno, a los efectos pertinentes de la Ley Electoral. Nombro a dicho Organismo Directivo Central la suprema autoridad de dicho partido, y sus acuerdos se acreditarán ante usted, y los organismos y funcionarios del Gobierno, mediante certificaciones firmadas por su Presidente y Secretario."

En apoyo de su planteamiento de que la petición debía desestimarse por adolecer de un defecto fatal de partes, argumentó la representación legal del Secretario en la vista oral que de acuerdo con la Regla 15.1 de las de Procedimiento Civil toda acción debe instarse a nombre de la parte realmente interesada; que hasta ese momento no había un partido por petición porque no se habían acumulado peticiones en ¾ partes de los precintos electorales y por el 10% del total de votos depositados para Gobernador en las elecciones anteriores; que lo que existía eran gestiones para la inscripción de determinados precintos en las cuales los peticionarios

habían servido de intermediarios, sin que existiera hasta ese momento un Partido de Acción Cristiana o un organismo directivo central con vida legal; que por lo tanto, de haber alguna querella contra la acción del Secretario correspondía la misma bien a los propios electores peticionarios o a los candidatos postulados, y que los demandantes podían demandar si se tratara de sus propias propuestas de candidatos en el precinto en que ellos eran electores, de no aceptárseles dichos candidatos. Veamos la situación.

La sección 14 de la Ley Electoral dispone que los partidos políticos son los partidos principales y los por petición, describiendo a los principales como aquellos cuyo candidato para Gobernador hubiera obtenido en las últimas elecciones generales inmediatamente precedentes un número de votos igual al 10% o más del total de votos depositados en dichas últimas elecciones generales inmediatamente precedentes por todos los partidos para todos los candidatos a Gobernador de Puerto Rico; y describiendo a los por petición como cualquier partido político que, con arreglo a la sección 112 de la Ley, inscriba en el Departamento de Estado para las elecciones inmediatamente siguientes, candidatos por petición en y para las ¾ partes o más de los precintos electorales del Estado Libre Asociado, y presente en dicho Departamento para esas elecciones peticiones para el nombramiento de candidatos firmadas por un número de peticionarios igual al 10% o más del total de votos depositados para todos los candidatos para el cargo de Gobernador de Puerto Rico en las últimas elecciones generales inmediatamente precedentes.

¿Qué es un partido político? Cabanellas, en su Diccionario de Derecho Usual (1954), Tomo III, se expresa sobre ellos así:

"Agrupación que aspira al gobierno o dominación del Estado y con ideas o programa más o menos definido y leal para tal empresa. Para Bluntschli los partidos políticos son 'grupos sociales libremente formados, en los que ciertas opiniones o tendencias unen a sus miembros para una acción política común'.

Para Burke, el 'conjunto organizado de hombres unidos para promover por sus esfuerzos conjugados el interés nacional, según el principio particular sobre el cual se han puesto todos ellos de acuerdo' ".

El Profesor Bruce, en su libro *American Parties and Politics*, 3a. ed., considera la de Edmund Burke como la definición clásica del partido político. Y cita del Profesor McLaughlin: "El establecimiento del llamado gobierno del pueblo trajo partidos. . . . No podemos concebir la posibilidad de llevarnos sin ellos; es más fácil imaginarse la demolición de cualquier parte de nuestra organización constitucional, la sumersión de gran parte de lo que la Constitución describe, que imaginarse el manejarnos sin combinaciones políticas; ellas son nuestras instituciones vitales, ellas moran profundamente en el espíritu del pueblo". . . . Más adelante, del mismo escritor: "Con infinita labor, los hombres que forjaron nuestra Constitución expusieron ideas de libertad individual; ellos proyectaron con habilidad un sistema inteligente de contrapesos de modo que el gobierno no pudiera causar daño; pero dejaron a arreglos casuales o al azar, o a las asociaciones voluntarias desconocidas a la ley y desconocidas a la teoría del estado, la labor difícil que constituía en sí mismo el gran problema de la democracia. A estas asociaciones, que pronto surgieron, se les dejó la encomienda de ofrecer un medio para trasmitir la voluntad del pueblo al gobierno."

Comenta Bruce que una de las lecciones severas a ser aprendidas en una democracia es que ningún mecanismo automático, mucho menos constituciones, cartas orgánicas y leyes pueden asegurar permanentemente la eficiencia y efectividad del gobierno por el pueblo. Para éste, muchas fuerzas deben ponerse en movimiento fuera de la estructura constitucional para efectuar la vital conexión entre el pueblo y sus organismos gobernantes. Es a través de partidos políticos que no solamente la opinión pública se traduce en acción, sino que un continuo enlace entre las autoridades go-

bernantes y los componentes del estado se mantiene. Los partidos siempre han estado fuera de la estructura del gobierno, sin embargo ellos han constituido su sangre, su carne y su sistema nervioso. Aparte de una conciencia pública sana y activa, aparte de la educación moral y política de un pueblo, aparte de los vehículos de publicidad, —prensa, radio, las plataformas, —que se combinan para mantener al pueblo unido e informado, un hecho se ha reconocido desde el principio como absolutamente esencial a una democracia eficiente: el partido político moderno. McLaughlin, citado por Bruce, define el partido político en forma más realista como un grupo de hombres que fluctúa en cuanto a su personal y a su número, que adquiere un organismo y desarrolla un espíritu de cuerpo y un sentido de sí mismo, que han comenzado a trabajar juntos para obtener algún fin político o para oponerse a otros hombres contra quienes por alguna razón ellos sienten antagonismo. Uno de los hechos de no pocas consecuencias, según Bruce, es que los partidos políticos son asociaciones voluntarias. Las definiciones que de los partidos políticos en general han dado las cortes ante controversias legales específicas siguen el concepto político-social ya expresado de estos organismos del pueblo.(¹)

Como un buen principio a tono con el concepto de lo que

(¹) Las cortes han catalogado al partido político como la *asociación voluntaria* de personas que creen en ciertos principios de gobierno, con el propósito de promover sus ideas políticas mediante la nominación de candidatos a puestos públicos; de controlar la estructura gubernamental; para poner en vigor sus ideas sobre política pública. No son creación de la ley y tienen poder absoluto sobre sus asuntos internos en ausencia de reglamentación legislativa.

*Véase*: *Barceló* v. *Saldaña* (1931), 42 D.P.R. 226, 254; *Kelso* v. *Cook* (1916), 110 N.E. 987, 994–995; *Schafer* v. *Whipple* (1898), 55 Pac. 180, 181–182; *Riter* v. *Douglass* (1910), 109 Pac. 444, 450; *Morrow* v. *Wipf* (1908), 115 N.W. 1121, 1127; *State* v. *Stewart* (1922), 210 Pac. 465, 468; *Swindall* v. *State Election Board* (1934), 32 P.2d 691, 695; *Robinson* v. *Holman* (1930), 26 S.W.2d. 66, 67–68; *Yuratich* v. *Plaquemines Parish Democratic Exec. Com.* (1947), 32 So.2d. 647, 652–653; *Chambers* v. *I. Ben Greenman Ass'n* (1945), 58 N.Y.S. 2d. 637, 640; *State* v. *Cleveland-Cliffs Iron Co.* (1959), 157 N.E.2d. 331, 333.

son los partidos políticos como organismos de expresión del pueblo, particularmente en un régimen político como el presente en que según el preámbulo de nuestra Constitución es la voluntad del pueblo la fuente del poder público, y se asegura la libre participación del ciudadano en las decisiones colectivas, nuestra Ley Electoral no crea los partidos políticos ni los organiza o define, ni determina o estructura sus organismos internos, ni tampoco su funcionamiento. Se ha servido de ellos y los utiliza como vehículos apropiados del proceso electoral que conduce a la elección de aquellos funcionarios y organismos del gobierno que constitucionalmente han de elegirse por el voto popular.

Como tal vehículo utilizable en el proceso electoral, cuando se radicó el presente recurso de Mandamus el Partido Acción Cristiana no era un partido político a tenor de lo dispuesto en la sección 14 de la Ley Electoral, ya que no era un partido principal por no haber participado en las elecciones de 1956 y por ende no haber votado para Gobernador, ni tampoco lo era por petición, porque hasta ese momento no había inscrito en la oficina del Secretario de Estado para las elecciones de 1960, peticiones en ¾ partes de los precintos electorales ni en número igual al 10% de todos los votos depositados para Gobernador en 1956. En consecuencia, su "Organismo Directivo Central" tampoco era el organismo directivo central al que a través de las disposiciones de la Ley Electoral frecuentemente se hace referencia para darle ciertas atribuciones a lo largo del proceso eleccionario. En cuanto a eso, tiene razón el Secretario de Estado. Sin embargo, en el concepto social-político que hemos mencionado al principio, es innegable que existía una agrupación o asociación de personas organizada y dirigida por los demandantes, para acudir a las elecciones con un programa o idea de gobierno aceptable para ese grupo. En tal sentido, como núcleo de expresión de una parte del electorado, se trataba de un partido político con un cuerpo directivo se-

leccionado por ellos, que si bien aún no había entrado, esperaba entrar en el mecanismo de la Ley. En ese mismo sentido, la propia Ley Electoral les otorgaba cierto reconocimiento al disponer en la sección 37 que los componentes de este grupo o núcleo de expresión podían hacer constar en cada petición "el nombre del *partido*" que representaban, más un "emblema" sencillo bajo el cual se imprimiría en la papeleta electoral el nombre del candidato de *"dicho partido"*, prohibiéndoles mas adelante como *"partido político"* que nombraba candidatos por petición, usar o adoptar un nombre o emblema usado o adoptado por otro partido político. Eso lo dispone la ley cuando aún se está en la etapa de inscribir peticiones en el número requerido de precintos con el número requerido de votos de modo que, cumplidos dichos requisitos, esa agrupación viniera a ser, junto a los partidos principales, otro vehículo electoral.

Al surgir un conflicto entre esa agrupación y el Secretario de Estado que indudablemente afectaba o entorpecía sus aspiraciones a convertirse en un vehículo eleccionario dentro de la Ley Electoral por no estar dispuesto el Secretario a permitirle peticiones de candidatos suscritas por los recientemente inscritos, no hay la menor duda que los demandantes como miembros, organizadores, participantes, dirigentes, y mandatarios expresos de esa asociación, tenían interés suficiente en la controversia y eran partes realmente interesadas en obtener un fallo judicial a su favor, aun cuando no se tratara del rechazo de sus propias peticiones.

Aún en el supuesto de que los demandantes no cualificaran dentro del tecnicismo procesal de la Regla 15.1, podían ser demandantes bajo la reconocida doctrina de la representación virtual o implícita que rige precisamente en aquellos casos de grupos nutridos o asociaciones que por si mismas no tienen capacidad para demandar y ser demandadas, siendo las partes numerosas, en donde cualquier miembro del grupo puede

interponer la acción que tenga un propósito o interés común a todos, siendo superfluo el que cada uno demande individualmente.(²)

■ Los fundamentos (b) y (c) para desestimar la petición, al efecto de que la misma era académica o prematura, no ameritan mayor consideración. La contención del Secretario es que los electores tenían hasta el 28 de agosto para presentar peticiones según la sección 37, y él hasta el 15 de septiembre para certificar los nombres de los candidatos presentados en su oficina, de acuerdo con la sección 41, y que por lo tanto no tenía obligación en ley de rechazar oficialmente peticiones antes de esas fechas. Aparte de que un rechazo después de vencido el término para presentar peticiones hubiera privado a los peticionarios de presentar otras en sustitución, el Secretario aceptó en su contestación al recurso haber manifestado a los demandantes no estar dispuesto a aceptar peticiones firmadas por los electores nuevamente inscritos. Existía una controversia real y efectiva que ni era académica ni prematura.

■ Vamos a los méritos del caso. La sección 37 de la Ley Electoral dispone que "[T]oda persona que firmare una petición para nombrar un candidato para un cargo, hará constar que es un elector de Puerto Rico debidamente inscrito y que está capacitado para votar por el candidato o candidatos nombrados en dicha petición, y el nombre, edad, color, precinto y barrio en el cual aparezca su inscripción como elector," . . . La Ley no contiene una definición del

---

(²) Véase: Clark on *Code Pleading*, pág. 201–205; *Smith et al* v. *Swormstead et al* (1853), 16 Howard 288, pág. 302; *Carpenters' Union* v. *Citizens' Committee* (1928), 164 N.E. 393, 403; *Meier* v. *Johnston* (1933), 149 So. 185; *Hasinger et al* v. *New York Central Mut. Fire Ins. Co.* (1935), 178 Atl. 153, 154; *Davis et al* v. *Hudgins* (1920), 225 S.W. 73, 76; *Presbiterian Church et al* v. *Johnson* (1931), 238 N.W. 456, 457; *Aalco Laundry Co. et al* v. *Laundry Linen etc.* (1938), 115 S.W.2d. 89, 90; *Quinn* v. *Buchanan* (1957), 298 S.W.2d. 413, 418.

concepto de capacidad para votar, por lo que hay que buscarlo a través de sus diversas disposiciones. (³)

La sección 4 de la Ley dispone que todo varón, ciudadano de los Estados Unidos, *cuyo nombre constare en la lista de inscripciones*, deberá votar en el distrito municipal en que residiere. (⁴)

La primera Ley Electoral de 8 de marzo de 1906 en su sección 34 referente a candidaturas por petición dispuso que las peticiones no serían consideradas a menos que vinieran

---

(³) La Ley de Inscripciones de 1939 usa el término "elector capacitado" en sus secciones 6 y 14 refiriéndose a la conformación de las Juntas de Inscripciones. La Ley Orgánica de 12 de abril de 1900 dispuso la elección de una Cámara de Delegados por los "electores capacitados" según se proveía más adelante, y luego determinó que podrían votar todos los ciudadanos de Puerto Rico que real y efectivamente hubieran sido residentes por un año y poseyeran las *condiciones de electores* con arreglo a las leyes y órdenes militares en vigor en 1ro. de marzo de 1900 con sujeción a las modificaciones que prescribiera el Consejo Ejecutivo. En esa fecha regía la Ley Electoral española de 1890 adaptada a Cuba y Puerto Rico por Real Decreto de noviembre 25 de 1897, la cual disponía que todos los españoles varones mayores de 25 años en pleno disfrute de sus derechos civiles y que fueran residentes de la municipalidad en que hubieren residido por lo menos dos años, eran electores; y la Orden General Núm. 160 de 12 de octubre de 1899 que dispuso que los requisitos de los votantes en las elecciones municipales que se efectuaren de ahí en adelante serían ser varón, residente *bona fide* de la municipalidad, mayor de 21 años a la fecha de la elección, un contribuyente en la municipalidad donde votaba y saber leer y escribir. Además, haber residido en Puerto Rico durante los dos años precedentes y seis meses en la municipalidad. La Carta Orgánica de 1917 dispuso la elección de la Cámara y del Senado y de un Comisionado Residente por los "electores capacitados" de Puerto Rico, y que para las primeras elecciones los "electores capacitados" serían aquellos que tuvieran las condiciones de electores con arreglo a la ley vigente, y para las elecciones posteriores, deberían ser ciudadanos de Estados Unidos, mayores de 21 años de edad, que tuvieran las demás condiciones prescritas por la Asamblea Legislativa. La Constitución dispone que será elector toda persona que haya cumplido 21 años de edad, y reuna los demás requisitos que se determine por ley.

(⁴) La sección 15 según se enmendó en 1947 dice que todo ciudadano de Estados Unidos, hombre o mujer, de 21 años de edad o más en el día de las elecciones, que no estuviere legalmente incapacitado y que hubiere residido durante un año . . . en el municipio en donde se celebre la elección, deberá votar en dicho municipio, *siempre que figure inscrito su nombre en la lista de electores. . . .*

acompañadas de un certificado de inscripción debidamente expedido al peticionario. Pero en 1908 se enmendó dicha disposición por la Ley de 12 de marzo de ese año para estatuir en forma parecida al presente, que las solicitudes deberían firmarse por electores debidamente inscritos y capacitados para votar por los candidatos mencionados en la solicitud.

La sección 27 de la Ley ordena al Superintendente General de Elecciones a preparar listas provisionales de inscripciones, las que básicamente son listas de los que votaron en la elección anterior; listas de los electores inscritos en el año de elecciones, y listas de transferencias de inscripciones. Tanto la Ley Electoral como la Ley de Inscripciones contienen procedimientos y mecanismos, que no es necesario ahora pormenorizar, de modo que aquellos que se hubieren inscrito sin los requisitos legales o cuyas inscripciones fueran nulas o defectuosas sin haberse corregido, y aquellos que inscritos, hubieren muerto o se hubieren incapacitado para votar, queden excluidos de las listas de inscritos que constituyen la base de la votación. Estos procesos de depuración deben llegar a su fin para el 31 de julio del año de elecciones.

La sección 19 de la Ley de Inscripciones estatuye que con excepción de las peticiones de inscripción que la ley declara defectuosas y que deberán corregirse de la manera que se dispone, y de las peticiones de inscripción que la ley declara nulas, *todas las demás peticiones de inscripción se considerarán válidas para todos los efectos electorales y legales*. La sección 12 de la Ley Electoral se expresa en sentido parecido al disponer que a no ser en virtud de orden de un tribunal competente, la Junta Insular de Elecciones no podrá en forma alguna cancelar, rechazar, invalidar o anular la inscripción legal de un elector ni privar a un elector inscrito de su derecho al voto, y que dicha Junta solamente deberá cancelar aquellas peticiones de inscripción que se declaran nulas en la Ley de Inscripciones.

No hay disposición alguna en la vigente Ley Electoral, ni de Inscripciones, ni la ha habido en la legislación electoral anterior, que disponga, o que implique de manera indirecta que el elector debidamente inscrito que está capacitado para votar por el candidato nombrado en la petición a que se refiere la sección 37 de la Ley es aquel elector inscrito que votó en elecciones anteriores, y no puede ser aquel elector inscrito que se inscribió por vez primera en las inscripciones para las elecciones venideras. No se desprende razón alguna a través de toda la filosofía de la Ley Electoral que requiera que por interpretación nuestra impongamos tal limitación al firmante de una petición para inscribir un partido; limitación que la ley expresamente no la estatuye. Es obvio que una petición hecha y firmada por un elector que aparece inscrito en las listas y luego se le excluye de la inscripción por cualquiera de los fundamentos que permite la ley perdería dicha petición su valor legal y sería inefectiva.

■■ Finalmente, aun cuando la situación fuera dudosa en que lo mismo pudiera caber una interpretación o la otra, no estaríamos inclinados a sancionar aquellas que tendría el efecto de privar de parte de la franquicia electoral a todo el nuevo electorado inscrito, en este caso unos 264,000 electores, o sea más de una cuarta parte de toda la masa electoral en las listas de votantes. El disfrute de la franquicia electoral no constituye solamente el ejercicio del voto en las urnas el día de las elecciones sobre candidatos y partidos que aparecen en la papeleta, sino también el derecho del ciudadano a que candidatos de su elección aparezcan en la papeleta. Privar a los nuevos inscritos de su derecho a someter peticiones con candidatos de su selección prestos a establecer normas de gobierno que ellos desean, equivaldría a obligar a todo el nuevo electorado a votar por los candidatos y plataformas de gobierno de los partidos ya existentes, a menos que acudan a la columna libre en la papeleta, sin poder ellos crear partido nuevo alguno. Una interpretación así de nues-

tra parte no respondería a la política pública de la Ley Electoral que se inspira en una buena democracia.

*Por las razones anteriormente expuestas dictamos sentencia en 4 de agosto de 1960 declarando sin lugar las desestimaciones solicitadas y con lugar el recurso de mandamus.*

El Juez Presidente Sr. Negrón Fernández expresará por separado los fundamentos de su disenso.

Los Jueces Asociados Sres. Blanco Lugo, Rigau y Dávila, quienes no formaban parte del Tribunal cuando se resolvió el recurso, tampoco intervinieron en esta opinión.