JUAN M. GARCÍA PASSALACQUA, recurrente, *v.* TRIBUNAL ELECTORAL, recurrido.

*Número:* O-76-302          *Resuelto:* 13 de agosto de 1976

*Juan M. García Passalacqua,* por derecho propio; *Eugenio S. Belaval, Procurador Electoral,* y *Héctor Ricardo Ramos Díaz, Procurador Electoral Alterno,* abogados del Partido Nuevo Progresista; *Héctor Luis Acevedo, Procurador Electoral,* abogado del Partido Popular Democrático; *Felipe Cirino Colón* y *Reinaldo Pérez Ramírez, Procuradores Electorales,* abogados del Partido Socialista Puertorriqueño; *Ramírez & Rivera,* abogados del Tribunal Electoral.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Ante el postulado constitucional de que el sistema político puertorriqueño está organizado sobre una base plenamente democrática, y la íntima relación que el mismo tiene con la certeza y estabilidad del proceso electoral, acordamos expedir y disponer en sus méritos el presente recurso de revisión.[1]

Aduciendo ser inconstitucionales, el recurrente Juan M. García Passalacqua impugna las reglas 3.1.1 y 5.2.2(d)[2] promulgadas por el Tribunal Electoral para regir en los pró-

---

[1] A un recurso anterior promovido por el mismo peticionario (Juan M. García Passalacqua v. Tribunal Electoral, 0-76-11), en el cual se planteaban cuestiones idénticas con relación al Reglamento de Primarias, nos negamos a expedir el auto mediante Resolución de fecha 29 de enero de 1976.

[2] Disponen:

"R. 3.1.1—Certificación Especial del Partido Político con relación a sus Candidatos a Senadores y Representantes por Acumulación.—

"Al entregar el juramento de los candidatos a representantes y senadores por acumulación del partido, según dispone el Artículo 7-002 del

ximos comicios la elección de los candidatos por acumulación. En síntesis estas reglas autorizan a los partidos políticos a nominar hasta once (11) candidatos a tales cargos; permite a los partidos determinar el precinto en que figurará en primer lugar en la papeleta electoral determinado candidato; y establece que el voto íntegro por un partido político se adjudicará a favor del candidato que aparezca en primer término.

Apoya el recurrente sus planteamientos argumentando que la Convención Constituyente rechazó *expresamente* la práctica de que los partidos políticos limitasen el número de candidatos a nominarse a los cargos por acumulación; que el Código Electoral vigente derogó la sección de la antigua ley que permitía a los partidos determinar en qué precintos figuraría cada uno, sustituyéndola por el Art. 1-003, incisos 27 y 28 (16 L.P.R.A. sec. 2003 (27) y (28)); y que tales reglas violan los derechos constitucionales de libre expresión y asociación, la igual protección de las leyes y el precepto de que el voto sea igual, directo y secreto. Por último señala, como objeción principal, que ello constituye una redistribución extraoficial ilegal

---

Código, el Presidente y el Secretario deberán certificar la lista de candidatos del Partido a esos cargos en determinado orden para cada precinto. Será deber del Tribunal Electoral ordenar la impresión de los nombres de dichos candidatos en la papeleta electoral de cada precinto, siguiendo estrictamente el orden en que le fueron certificados al Tribunal por cada partido. "R. 5.2.2.—Manera de Votar.—

"a . . . . . . . .
"b . . . . . . . .
"c . . . . . . . .

"d. Manera de Votar Legisladores por Acumulación: El elector podrá votar a favor del candidato para Senador o Representante por acumulación que prefiera de las siguientes maneras: 1) votando la candidatura íntegra del partido, en cuyo caso se entenderá que su intención fue votar por el nombre del candidato que para dichos cargos figure en primer término en el orden impreso de la papeleta electoral; (2) podrá también demostrar su intención de votar por otro candidato que no sea el que figure en primer término en el orden impreso de la papeleta cuando además de marcar la papeleta electoral a favor de la insignia de un partido en particular, hace además alguna cruz o señal al lado del nombre o insignia de un candidato por acumulación, en cuyo caso, esta señal se entenderá como que el candidato así marcado, fue la intención del elector votarlo."

que contraviene las disposiciones de la Sec. 4 del Art. III de la Constitución que fija la labor de revisar los distritos en la Junta Constitucional de Revisión de Distritos Electorales, Senatoriales y Representativos.

El Tribunal Electoral, el Partido Popular Democrático y el Partido Nuevo Progresista radicaron sus respectivos alegatos dentro del término concedido exponiendo diversos argumentos en contra de tales planteamientos. El Partido Socialista Puertorriqueño no presentó el suyo, solicitando la celebración de una vista oral, la cual denegamos el 4 de agosto en consideración a que nuestra Resolución del 13 de julio de 1976—notificada el día 14 a su Procurador Electoral—apercibía a todas las partes, que una vez transcurrido el término para comparecer, el caso quedaría sometido para decisión en los méritos.

I

En su perspectiva histórico-jurídica, la concepción del cargo y la elección de legisladores por acumulación en Puerto Rico es una combinación del método de representación proporcional y territorial, que se remonta a la Carta Orgánica del 1917, la cual en sus Arts. 26 y 27 respectivamente disponía la elección—en adición a los miembros fijos correspondientes a los distritos senatoriales y representativos—de cinco senadores y cuatro representantes por acumulación. La pieza legislativa aprobada entonces para regular el trámite relacionado con el proceso electoral fue la Ley Núm. 79 de 25 de junio de 1919—denominada Ley Electoral y de Inscripciones —la que en su Sec. 43 ordenaba la impresión separada de dos clases de papeletas: una nombrada "papeleta general" a usarse para todo cargo electivo, con excepción de los candidatos por acumulación los que se consignaban y votaban en una "papeleta especial". La ley nada mencionaba sobre la intervención de los partidos políticos respecto al orden de impresión en que figurarían dichos candidatos en la papeleta.

Mediante la Ley Núm. 64 de 8 de mayo de 1936, esta sección fue enmendada eliminándose las dos papeletas y proveyéndose una sola denominada "papeleta electoral", la cual contendría ". . . todos los candidatos de elección en cada municipio y precinto de la Isla." En lo relativo a los candidatos por acumulación se aclaró que ". . . el Superintendente General de Elecciones ordenará la·impresión de los nombres de Senadores y Representantes por acumulación en el mismo orden en que le fueren certificados para cada municipio o precinto por el organismo director central del partido con derecho a proponer dichos candidatos"; y, además, se adicionó la Sec. 37a contentiva del siguiente lenguaje: "Los partidos políticos al expedir las certificaciones relacionadas con los candidatos para senadores y representantes por acumulación, lo harán por precintos electorales y será deber del Superintendente General de Elecciones ordenar la impresión de los nombres de dichos candidatos en la papeleta electoral por el orden en que le fueron certificados al Secretario Ejecutivo de Puerto Rico por los organismos directivos centrales de los partidos principales o partidos por petición."

El método de seleccionar candidatos por acumulación y los textos de ley transcritos, permanecieron inalterados antes, durante y después de la aprobación de la Constitución hasta la vigencia del Código Electoral (Ley Núm. 1 de 13 de febrero de 1974; 16 L.P.R.A. sec. 2001 *et seq.*).

El legajo de la Convención Constituyente demuestra que la organización, composición y procedimiento del cuerpo legislativo y la selección de sus miembros fue objeto de amplio estudio y deliberación.[3] Para sostener que el sistema de elección de los candidatos por acumulación fue repudiado por dicho foro, el recurrente descansa en las recomendaciones contenidas en el informe preparado por la Escuela de Administra-

---

[3] Véase: *Informe Complementario de la Comisión de la Rama Legislativa, 4 Diario de Sesiones de la Convención Constituyente,* pág. 2590 (Ed. Equity, 1961).

ción Pública de la Facultad de Ciencias Sociales de la U.P.R. que forma parte de la compilación publicada bajo el nombre de *La Nueva Constitución de Puerto Rico*, y en el resultado de votación de una enmienda propuesta a la Asamblea Constituyente por el delegado Sr. José Rosario Gelpí.

El informe de la Escuela de Administración Pública señalaba:

"La elección de representantes y senadores por acumulación asegura una mayor proporcionalidad en la representación. En la actualidad, y según las disposiciones de la Ley Orgánica, nueve de los cincuenta y ocho miembros de la legislatura bicameral se eligen sobre la base de que cada elector puede votar por uno solo de los candidatos que los respectivos partidos proponen a toda la isla, sin limitaciones referentes a los distritos. Debería aumentarse el número de legisladores a elegir de esta manera. Y así se ofrecerían a las minorías mejores oportunidades para elegir un porcentaje de representantes en armonía con los votos que cada una consiga. Esta reforma también haría posible la elección de más hombres con respaldo general, que no dependan tanto de las organizaciones locales de los partidos.

Convendría considerar, sin embargo, el establecimiento de un sistema más puro de representación proporcional para la referida clase de delegados. *El que ahora existe obliga a los partidos a dividir la isla, extraoficialmente en distritos presentando en cada sector los candidatos correspondientes, de modo que se distribuya por igual el total de votos y no quede ninguno de esos candidatos sin elegir por un mero error de cálculo.* Es realmente una mezcla del sistema proporcional con el territorial, que hasta cierto grado obliga a los candidatos a contar con respaldo de carácter regional y que se presta a injusticias por motivos de matemática electoral. Mejor sería el voto por listas, legalmente establecido, para tal clase de legisladores. Según éste, cada partido podría postular en orden de preferencia sus candidatos, y los electores votarían por partidos, eligiendo cada uno de ellos un número de candidatos de la lista respectiva correspondiente a su porcentaje de votos." *Op. cit.*, págs. 264–265. (Énfasis suplido.)

En resumen, a la Asamblea Constituyente se le hicieron las siguientes observaciones y señalamientos: necesidad de

corregir la situación electoral de los partidos de minoría, garantizando su presencia en la Legislatura; aumento en el número de escaños legislativos por acumulación como método de asegurar mayor proporcionalidad; reconocimiento y crítica del sistema prevaleciente de elección de tales cargos mediante el cual los partidos políticos dividían la isla, extraoficialmente, en varios distritos electorales; y sustitución del sistema para que la elección de los mismos fuera a través de listas.

Dichas recomendaciones sólo se adoptaron parcialmente, ya que la composición y organización actual del Poder Legislativo quedó establecida siguiéndose sustancialmente la proposición sustituta formulada por la Comisión concernida, que leía así:

"Sección 1. El Senado se compondrá de veintisiete senadores y la Cámara de Representantes de cincuenta y un representantes, [excepto cuando dicha composición resultare aumentada en alguna de las cámaras a virtud de lo que se dispone en la sección 4.]

Sección 2. Para los fines de la elección de la Asamblea Legislativa, Puerto Rico estará dividido en ocho distritos senatoriales cada uno de los cuales elegirá dos senadores, y en cuarenta distritos representativos, cada uno de los cuales elegirá un representante, estando compuesto cada distrito senatorial de cinco distritos representativos.

Se elegirán además once senadores por acumulación y once representantes por acumulación, y resultarán electos los candidatos que reciban el mayor número de votos para tales cargos. Cada elector no podrá votar por más de un candidato para senador por acumulación ni por más de un candidato para representante por acumulación." 2 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, pág. 1274.

En virtud de esta disposición, en unión a la Sec. 7, se aumentaron los miembros regulares en ambos cuerpos y los cargos a candidatos por acumulación y, como excepción a la composición numérica básica, se vislumbró y autorizó la representación de partidos de la minoría.

No hay constancia de repudio alguno de parte de la Convención Constituyente al sistema de designación y selección por los partidos políticos de los candidatos por acumulación. La contención del recurrente al efecto es errónea. El delegado señor Gelpí infructuosamente intentó eliminar los cargos de senadores y representantes por acumulación, expresando como fundamento que la papeleta electoral sería demasiado "grande", proponiendo un sistema, a su juicio, menos complicado que el entonces bajo discusión y finalmente aprobado. Su enmienda proponía dividir la isla en ocho distritos electorales, fijaba el Senado en veinticuatro (24) miembros y la Cámara en cincuenta y seis (56) y proveía que cada partido político—aun cuando podía nominar tres (3) candidatos al Senado y siete (7) a la Cámara por cada distrito—no podría elegir más de dos (2) senadores ni cinco (5) representantes, independientemente del número de votos que hubiese obtenido, ante lo cual se proclamarían electos los tres (3) candidatos al Senado y los siete (7) representantes de los otros partidos políticos que hubiesen obtenido mayor número de votos en el distrito electoral correspondiente. 2 *Diario de Sesiones de la Convención Constituyente*, págs. 1279–1280; 1286–1288.

A tono con la composición descrita es que dicho delegado propuso el texto en que el recurrente apoya su planteamiento, a saber: "Cada partido u organismo político que hubiera nominado candidatos para senadores o representantes o para ambos cargos determinará el orden en que desee figuren sus respectivos candidatos en la papeleta oficial de votación, bien por distritos electorales o por municipios." Dicha enmienda fue derrotada por la Asamblea al igual que el resto de la propuesta.

De lo expuesto, resalta a la vista que la enmienda no se refería ni podía aplicarse a los candidatos a legisladores por acumulación. Formaba parte integrante de una propuesta total que precisamente, entre sus objetivos, eliminaba la existencia de tales cargos. Es erróneo por lo tanto atribuir a este

incidente un repudio al método prevaleciente durante la época en que se discutió y aprobó la Constitución.

Contrario a la posición del recurrente, dicho debate y el subsiguiente, nos lleva a concluir que los redactores de nuestra Constitución no se manifestaron en contra de eliminar los cargos por acumulación y de sustituir el sistema de selección en vigor, del cual estaban conscientes:

"SR. GELPÍ: . . . [C]ada partido [se] *autoriza* a presentar once nombres para representantes y once candidatos para senadores. *Ahora, que cada partido después escoja cualquier número menor de candidatos, es una cosa completamente distinta.* Pero la ley es la ley. Y las votaciones se hacían anteriormente—y fue a propuesta mía, yo fui quien redacté ese proyecto de ley de que los candidatos at large se colocaran por los municipios en el orden que quisiera cada uno de los partidos políticos y que el elector que no sabe leer ni escribir y vota debajo de la insignia, está votando el primer candidato que figura allí en el municipio en que está votando. Esa enmienda la hice yo a la ley electoral. Por eso es que conozco mejor que muchos ese procedimiento.

SR. RIVERA REYES: Señor Presidente: para una pregunta al compañero. Me gustaría que el compañero me dijera dónde dice aquí en este proyecto sustituto que cada partido va a seleccionar once candidatos por acumulación para representantes y once para senadores.

SR. GELPÍ: Dice: 'Se elegirán además once senadores por acumulación y once representantes por acumulación' . . . . .

SR. RIVERA REYES: . . . Ahora lo que me gustaría saber es que esa afirmación que ha hecho el compañero, me la aclare: De que cada partido va a llevar once candidatos por acumulación para representantes y senadores.

SR. GELPÍ: Pero la ley lo dice, y lo dice la propia constitución ésta que se está redactando a menos que el señor Presidente de la Comisión diga que es falso lo que yo estoy diciendo, a ver si es verdad que *cada partido tiene derecho* o no tiene derecho a presentar once candidatos por acumulación para representantes y once candidatos para el Senado.

SR. RIVERA REYES: Tener derecho, ¿quiere decir, que de acuerdo con el compañero, que tiene derecho, es lo que dice aquí en la página dos, línea dos, la oración que sigue ahí?

SR. GELPÍ: Sí, señor, y saldrán electos todos los candidatos que obtuvieron el mayor número de votos. Entonces hay once. No es uno.

SR. RIVERA REYES: Once por todos los partidos. ¡Ah! Once por todos los partidos.

SR. GELPÍ: Claro que sí, cada partido tiene derecho a elegir once. *A nominar once candidatos, sí, señor. La palabra que he usado debe ser 'nominar' candidatos.*" *Op. cit.*, pág. 1289. (Énfasis suplido.)

■ En resumen, son inescapables las siguientes conclusiones: la Asamblea Constituyente no se pronunció en contra de la práctica impugnada por el recurrente; no siguió todas las recomendaciones del informe de la Escuela de Administración Pública; no varió la forma conocida de seleccionar los candidatos por acumulación con la intervención de los partidos políticos; y se aumentó los cargos por acumulación a once (11) en cada cuerpo. En consecuencia resolvemos, que el derecho constitucional de los partidos políticos a nominar once (11) candidatos por acumulación no es equivalente ni se traduce en una obligación electoral de postular tal número. Esta conclusión es la única que está en consonancia con uno de los objetivos básicos que animó a la Convención Constituyente, a saber, que los partidos minoritarios tuvieran la oportunidad de estar representados en la Asamblea Legislativa. El nominar un partido mayoritario un número menor de once (11) candidatos a los cargos legislativos por acumulación, tiene el efecto inmediato de que los candidatos por acumulación de los otros partidos puedan ocupar los restantes cargos en orden a los votos obtenidos.

## II

Teniendo en mente la trayectoria histórica-constitucional, analicemos el argumento en el sentido de que las reglas adoptadas por el Tribunal Electoral son ilegales por haber el Código Electoral derogado los preceptos de la ley anterior que permitían ". . . a los partidos determinar en qué precinto

correría cada uno de ellos y adoptó, en sustitución, el Artículo 1-003, items 27 y 28 del Código Electoral. 16 L.P.R.A. sec. 2003(27) y (28)."

La Asamblea Legislativa, en virtud de la cláusula derogatoria *general* consignada en el Art. 10-016 del Código, abolió las disposiciones de la antigua ley electoral, y por ende desaparecieron las secciones relativas al método de los partidos nominar y figurar el orden de los candidatos por acumulación. De igual modo, y como efecto de dicha cláusula *sui generis*, se derogó la Sec. 63 que contenía varias disposiciones de importancia relacionadas con la forma y manera de un elector votar papeleta mixta.

■ Es regla elemental que cuando una ley es derogada deja de existir. (⁴) No hay en los debates legislativos que precedieron a la adopción del Código, indicio alguno de rechazo expreso a las normas mencionadas. Ello implica que desde la vigencia del Código hasta la promulgación de las reglas que nos ocupan existió un vacío estatutario y reglamentario respecto a la intervención de los partidos políticos en cuanto al orden de impresión en que figurarían los candidatos por acumulación y en torno a las maneras adicionales de un elector votar, y no un repudio. Esta circunstancia es significativa en la determinación de si el Tribunal Electoral tenía autoridad para adoptarlas. La formulación de una respuesta racional y lógica exige que examinemos la facultad general y específica de dicho organismo.

■ El Art. 2-007(L) (16 L.P.R.A. sec. 2027) le confiere un amplio poder de aprobar "todas aquellas reglas y reglamentos que resultaren *necesarios* para el descargo de sus responsabilidades y *para cubrir todo aquello* que *no estuviere expresamente dispuesto* [. . . en el] Código, . . . que fuere *congruente* con los *propósitos* del mismo." *In fine*, también fija

---

(⁴) El Art. 6 del Código Civil (31 L.P.R.A. sec. 6) define las dos formas de derogarse una ley: expresa o tácitamente.

como norma rectora de interpretación, que los ". . . casos no previstos en la ley o en los reglamentos, . . . [se resuelvan] . . . conforme a equidad tomando en cuenta la razón natural de acuerdo con los principios generales del derecho y los *usos y costumbres generales establecidos.*" (Énfasis suplido.)

La redacción clara y sencilla de este precepto, tanto en su sentido literal como espiritual, no crea duda sobre su alcance. La autoridad conferida al Tribunal Electoral es abarcadora, sujeta solamente a que en las reglas que adopte concurran los siguientes factores: a) sean necesarias; b) no conflijan con disposición expresa estatutaria; c) intenten cubrir lagunas o áreas que no estén taxativamente comprendidas en la ley; y d) que la reglamentación se base en el concepto de equidad, aplicado conforme los principios básicos del derecho, usos y costumbres establecidas.

Sin ceñirnos estrictamente al orden expuesto, confrontemos los factores enunciados con la situación que se nos plantea.

El Código Electoral, en sus Arts. 7-008 y 7-062 (16 L.P.R.A. secs. 2338 y 2392), mantiene un lenguaje similar al de la anterior ley en lo concerniente a la existencia de una sola papeleta electoral y la manera básica de un elector votar. No obstante, consigna preceptos que confieren la aprobación del diseño y contenido de dicha papeleta al Tribunal recurrido, autorizándole además a aprobar, igualmente por reglamento, cualquier otro método de votar. Ello contrasta notablemente con la omisión de mencionar detalles relacionados con la impresión de la papeleta y con las formas en que un elector debe indicar en dicha papeleta los candidatos de su elección, y las maneras alternas de emitir un voto por papeleta mixta conforme lo disponía la anterior ley (16 L.P.R.A. secs. 143 y 220).

Se deduce pues un patrón legislativo, al cual no podemos atribuirle característica de accidentalidad; presenta más bien rasgos indicativos de un diseño jurídico preconcebido de delegar al Tribunal Electoral la redacción de innumerables reglas,

minuciosos trámites y detalles que por su naturaleza son susceptibles de ser dinámicamente adoptados e implementados por el organismo administrativo primario encargado de poner en vigor la Ley.

■ Los restantes factores están presentes. No albergamos dudas de que las reglas impugnadas por el recurrente no sólo son esenciales y vitales en la consecución de los objetivos electorales, tanto constitucionales como estatutarios, sino que están a tono con los axiomas básicos que nutren el concepto de equidad, en particular con los usos y costumbres establecidos que por décadas han regido con efectividad anteriores elecciones.

Las definiciones del Código de lo que constituye una papeleta *íntegra* y una *mixta*, y la expresión de que ambas exceptúan los candidatos por acumulación no militan en contra de la anterior conclusión. Al definir la papeleta *íntegra* como "aquella en que se vota por la candidatura *completa* de un solo partido político, *excepto los candidatos por acumulación*", el legislador está reconociendo simplemente que la adjudicación de un voto así emitido, cubre todos los candidatos propuestos por el partido concernido, con exclusión de los candidatos por acumulación, en vista de que, por ministerio de ley, todos estos últimos figuran en la única papeleta electoral disponible. La excepción responde a dos intereses cognocibles legítimos: primeramente, el preservar al máximo el derecho y la libre voluntad de un elector de poder seleccionar un candidato por acumulación irrespectivamente del orden en que éstos figuren en la columna de su partido; y segundo, en proteger tal voto contra la confusión y nulidad que conllevaría el definirse que un voto íntegro representa ". . . la candidatura *completa* de un solo partido . . . ." incluyendo los candidatos por acumulación, ya que se perpetuaría el absurdo de viciar *a priori* tal voluntad por constituir un voto nulo emitido para más de un candidato para el mismo cargo en contravención a lo dispuesto en la Sec. 3, Art. III de la Constitución. La defini-

ción de papeleta *mixta* como "aquella en que se vota marcando la papeleta individualmente y para cargo electivo, en cualquier combinación de candidatos pertenecientes a distintos partidos políticos o independientes, o escribiendo el nombre de su candidato por no encontrarse encasillado en la papeleta, excepto los candidatos por acumulación", parte de igual supuesto. Estas definiciones en nada confligen con la reglamentación aprobada por el Tribunal recurrido, la cual satisface plenamente los requisitos necesarios según previamente esbozados.

## III

Como fundamentos adicionales en apoyo de su alegación de inconstitucionalidad, el recurrente expone:

"La democracia puertorriqueña ha ido madurando progresivamente a través de los años. El voto independiente ha crecido geométricamente en años recientes, como sigue: 1960—0.38%; 1964—1.26%; 1968—4.72%; 1972—8.4%. Una encuesta este año lo coloca en un 14.4%. *El Nuevo Día*, 13 de septiembre de 1975, pág. 5.

La democracia en sí, y la norteamericana en particular, progresa hacia la protección de los candidatos y electores independientes, liberando a los pueblos de la limitante influencia y control de los partidos políticos. El voto por candidaturas es una versión del derecho de la libre expresión. Insistir en permitir que los partidos determinen el orden en que aparecen sus candidatos por acumulación en cada precinto electoral sería limitar el derecho a la libre expresión del elector en Puerto Rico.

El voto por candidaturas es, además, una versión del derecho de asociación. *Cf. Kusper v. Pontikes*, 38 L.Ed.2d 260 (1973). Permitir la nociva práctica señalada constituiría una violación de ese derecho.

El permitir que los partidos determinen el orden en que aparecen sus candidatos por acumulación en cada precinto electoral viola la igual protección de las leyes, pues hace que el voto de un elector independiente tenga menos peso, y sea menos efectivo, que el de aquél que vota una sola cruz por un partido en ese precinto.

Finalmente, dicha práctica viola el derecho constitucional al voto igual, directo y secreto. *Williams v. Rhodes, supra*. En este caso, el voto 'directo' del elector se diluye, ya que no es él quien escoge realmente su candidato por acumulación sino el partido, al colocarlo en primer lugar en la papeleta que se usa en su precinto. El voto del elector, en este caso, no 'sirvió su propósito'. *Cf. Fortson v. Morris*, 385 U.S. 231 (1966), pág. 250 (Fortas, disidente). Kirby, 'The Right to Vote', en *The Rights of Americans*, Vintage Books, N.Y., 1972."

■ Los preceptos constitucionales referentes al derecho de libre expresión, de sufragio universal, igual, directo y secreto, y el de la igual protección de las leyes, no se infringen con la reglamentación impugnada.

Primeramente, la regla que faculta a los partidos políticos determinar el orden en que figuren los candidatos por acumulación y la que dispone que ante un voto por papeleta íntegra se adjudique un voto al primero de tales candidatos, se promulgó con otras reglas que facultan a los electores el apartarse de dicho orden y votar por otro candidato al cargo, no solo de su propio partido, sino de cualesquiera otros, o por un candidato independiente. (5)

---

(5) Estas son:

"a. Voto íntegro a favor de un partido: Si desea votar la candidatura íntegra a favor de un sólo partido, el elector deberá hacer una cruz o línea de cualquier dimensión y forma arriba o abajo de la insignia del partido, o en cualquier espacio en la columna correspondiente a dicho partido excepto entre los espacios que están a la derecha o a la izquierda de los nombres de los candidatos. Votando de este modo, se contará el voto para todos los candidatos cuyos nombres aparezcan en la columna de dicho partido.

"b. Voto por candidaturas: Si el elector desea votar por candidatos, y no por la candidatura íntegra de un partido político, el elector marcará una cruz o línea en el espacio existente a la derecha o a la izquierda de la columna de cada partido. Votando de ese modo se contará el voto solamente para cada uno de los candidatos en cuyo espacio aparezca la marca. Esta papeleta será considerada como mixta a los efectos del escrutinio.

"c. También el elector podrá votar de la siguiente manera: Marcando una cruz o línea de cualquier dimensión o forma arriba o abajo de la insignia en la columna de determinado partido político, y marcando individualmente además, una cruz o línea en el espacio a la derecha o izquierda

Segundo, sin menoscabar el valor que representa en una sociedad dinámica democrática el voto independiente, no podemos atribuirle estado de inconsciencia al elector que vota papeleta íntegra y adjudica en consecuencia su voto al primero de los candidatos por acumulación de su partido. La preferencia hacia el voto íntegro se puede deber a diversas razones: habrá electores cuyo deseo es endosar plenamente y sin cualificación alguna los candidatos de su partido adoptando —sin que ello signifique una restricción al ejercicio de su libre albedrío—las decisiones de los organismos directivos de los partidos políticos por estimar que tal endoso tendrá, en los resultados finales, mayor efectividad frente a los de la oposición, y otros que considerarán ese método una decisión informada para asegurar la elección de aquellos candidatos que han de sostener el programa de gobierno que respaldan.

En tercer lugar, si concebimos el voto independiente como aquel que un elector emite fuera de la línea partidista, la existencia de las reglas que nos ocupan en nada afecta que continúe o no *in crescendo* el voto independiente. Sabido es que todos los candidatos de un partido político, incluyendo los de acumulación, figuran en la papeleta electoral en una misma columna vertical. El elector que va a votar actúa en virtud de una idea preconcebida antes de entrar en la caseta electoral o por decisión tomada en el momento. Bajo ambos supuestos, si su voluntad es votar por un candidato independiente, para hacerla valer, necesariamente tendrá que descartar los candidatos de su partido, independientemente del orden en que aparezcan. Para dicho elector, ni los nombres de los candidatos nominados ni el orden en que el partido político dispuso, será criterio determinante ni relevante; no está obligado a actuar

---

del nombre de uno o más de los candidatos de los demás partidos políticos para cualquiera de los cargos a votarse. En tal caso se entenderá que el elector votó por los candidatos así individualmente marcados, y por los candidatos para los restantes cargos que aparezcan en la columna del partido en la cual hizo una cruz o línea. Esta papeleta será considerada como mixta a los efectos del escrutinio."

en determinada forma ni se le resta voluntariedad a su decisión. ([6])

Las múltiples opciones que a un elector brinda la reglamentación aprobada, derrota la contención de que se limitan los derechos de libre expresión y asociación. Tampoco es correcto asumir que se infringe la igual protección de las leyes: el valor de un voto independiente y el de uno íntegro es el mismo ya que su efectividad e impacto no dependerá de la forma en que se ejercita, sino del número total que resulten una vez computados.

■ ·No se vulnera la disposición constitucional sobre voto igual, directo y secreto. La igualdad del voto es incuestionable y la secretividad no se pone en duda. El requisito de que el voto sea directo no significa, como sugiere implícitamente el argumento del recurrente, que para que un voto sea "directo" el elector tiene que hacer constar en cada uno de los candidatos por él seleccionados una marca separada e individual. La expresión constitucional de *voto directo* refleja el método de elección popular, mediante el cual intervienen todos los electores cualificados, contrapuesto con el método de votación indirecta a través de delegados. Su alcance fue explicado así por la Convención Constituyente:

"La elección de todo funcionario de elección popular será por voto directo. La Comisión señala que el plan, el sistema de elección de segundo grado, es decir, mediante votación indirecta, no es completamente democrático, pues el pueblo está en verdad delegando en otras personas un privilegio que le es inherente, el privilegio de que cada ciudadano por su propia responsabilidad, ejerciendo su propio criterio, exprese en los comicios a qué persona desea para determinado cargo." *Op. cit.*, págs. 2620-2621.

---

([6]) Las cifras citadas por el recurrente indicativas del aumento constante del voto independiente, corrobora este razonamiento, ya que como hemos visto, durante los períodos eleccionarios a que se refieren tales cifras estuvieron vigentes disposiciones de ley sustancialmente análogas a las reglas que nos ocupan.

## IV

■ Resta examinar la objeción principal que se formula consistente en que el sistema aprobado para la elección de candidatos por acumulación representa una redistribución extraoficial en contravención a la Constitución de nuestro país y a la de los Estados Unidos de América. La síntesis del argumento queda expuesta por el recurrente del siguiente modo:

"Al permitir que los partidos determinen en cuáles y en cuántos precintos electorales ha de figurar primero en la lista uno de sus candidatos por acumulación y al permitir que un voto íntegro cuente a favor del primero en la lista, este Honorable Tribunal estaría permitiendo que *de facto,* el partido en cuestión redistribuya los distritos de elección en detrimento de los votantes. Esto es aún más grave cuando la intención expresa de la Asamblea Constituyente fue que el precinto electoral de los candidatos por acumulación fuese *la isla completa,* como demostramos anteriormente."

Al inicio de esta opinión indicamos que tradicional y constitucionalmente la elección de legisladores por acumulación fue concebida, como una combinación del método de representación proporcional y territorial, y enfatizamos que la Asamblea Constituyente estaba consciente del sistema que prevalecía para elegirlos, en que intervenían los partidos políticos, sin que tal sistema fuera repudiado. También hemos analizado y esbozado las razones para concluir que el método utilizado no infringe las cláusulas de nuestra Ley Fundamental relativas a varios derechos básicos contenidos en su Carta de Derechos. Ello bastaría para disponer de este planteamiento; no obstante, consideramos de rigor aclarar varios extremos.

El mandato sobre redistribución de distritos electorales como medio para dar efectividad a la igualdad del derecho al voto de cada ciudadano, quedó plasmado en la Sec. 4 del Art. III de nuestra Constitución una década antes de que el

Tribunal Supremo Federal decidiera someter al escrutinio judicial los planes de redistribución de distritos electorales en virtud del caso normativo de *Baker* v. *Carr*, 369 U.S. 186 (1962). Dicho pronunciamiento inició lo que los estudiosos han caracterizado como la "revolución redistributiva" (*reapportionment revolution*). En esencia, la referida doctrina propugna el principio de que el voto de una persona tenga idéntico valor al de otra, y por ende los distritos electorales deben estar integrados en términos de población sustancialmente iguales.

A tal efecto, nuestra Constitución provee la creación decenal de una Junta, compuesta por el Juez Presidente de este Tribunal y dos miembros adicionales nombrados por el Primer Ejecutivo con el consejo y consentimiento del Senado, con la encomienda de examinar los distritos electorales senatoriales y representativos y fijarles los nuevos límites geográficos que sean necesarios para lograr la mayor igualdad poblacional posible, tomando como base el censo federal y las guías de contigüidad, compactibilidad y medios de comunicación.

Las funciones de la Junta Constitucional versan sobre la división territorial de la isla en sus ocho (8) distritos senatoriales y cuarenta (40) representativos. Su ámbito se circunscribe a la revisión de los distritos electorales fijos de los cuales se eligen los candidatos que componen regularmente ambos cuerpos legislativos; no considera, por no ser necesario, las normas referentes a los candidatos por acumulación cuya elección abarca y se decide contándose los votos de todos los electores de Puerto Rico. Una vez establecida por la Junta Constitucional la división electoral correspondiente, (7) los partidos políticos y el ordenamiento electoral vienen obligados a seguirla en lo concerniente a la elección de los candidatos de distritos regulares para el Senado y la Cámara.

---

(7) Bajo el mandato constitucional, la primera revisión y división fue adoptada el 23 de abril de 1964 y la segunda el 3 de abril de 1972.

La regla adoptada por el Tribunal Electoral que autoriza a los partidos políticos a determinar el precinto electoral y orden de sus respectivos candidatos por acumulación en conjunción con la que adjudica el voto íntegro al primero de ellos, no anula ni contradice las funciones de la Junta Constitucional. Las normas que se originan de las reglas adoptadas por el Tribunal Electoral y las de la Junta Constitucional, se desarrollan en dos esferas de acción distintas y no son incompatibles entre sí. El ámbito de las primeras cubre la elección de candidatos por acumulación y el de la Junta Constitucional la de los candidatos de los distritos regulares. Sea mediante papeleta íntegra o papeleta mixta, el alcance de un voto no dependerá del orden de la papeleta, sino de la decisión final del elector para lo cual se establecen válidas alternativas: en lo que atañe a los senadores y representantes fijos de distrito, su valor es adjudicable únicamente a tales fines; en lo concerniente a los candidatos por acumulación el voto trasciende los límites del distrito electoral en cuestión y es computado tomando en cuenta los demás emitidos a través de todo el país.

Finalmente, es importante destacar que el sistema puertorriqueño de elegir candidatos por acumulación no tiene precedente en la jurisdicción norteamericana.(8) Los casos y

---

(8) Un reconocido jurista en el campo de la redistribución electoral, conocedor de nuestro sistema electoral, Robert B. McKay, ex-decano de la Facultad de Derecho de la Universidad de Nueva York, se expresó sobre el particular del siguiente modo:

"El método de elegir los Senadores y Representantes por acumulación a la Legislatura de Puerto Rico aparentemente no tiene equivalente en los Estados Unidos continentales y por lo tanto precedente directo. *No obstante, por analogía y lógica los procedimientos aparentemente son defendibles y constitucionalmente válidos.* El único problema surge del hecho de que no existe requisito de residencia para ningún candidato a Senador o Representante por acumulación. Por lo tanto, es posible teóricamente que todos los candidatos por acumulación provengan de un solo distrito electoral. No obstante lo desafortunado (e improbable) de ello, la práctica no parece ser inválida. No existe requisito constitucional federal de que un candidato para un puesto electivo viva dentro del distrito específico que busca representar, y menos aún el requisito de que los candidatos por acumulación

autoridades citados por el recurrente se desarrollan con un trasfondo de hechos distintos y por ende no son aplicables en nuestro medio ambiente jurídico. Nuestra Constitución reconoce la existencia de los partidos políticos como grupos de opinión con derecho a proponer candidatos de su predilección, corolarios del derecho al sufragio y consustancial con la existencia misma de nuestra democracia política. *Dávila* v. *Secretario de Estado*, 83 D.P.R. 186 (1960). El que la ley autorice a los partidos políticos—en atención a sus cálculos pre-electorales, estrategia y otras razones—designar los precintos en que les resulta más conveniente ubicar en primer orden determinado candidato por acumulación, no disminuye ni diluye el voto de los electores, y como hemos visto, tampoco afecta *per se* la elección de candidatos independientes.

La Convención Constituyente con gran precisión expuso el objetivo principal justificativo del método:

"La mayor eficacia del proceso democrático hace aconsejable que todos los sectores geográficos del país estén representados en su cuerpo legislativo. *Este principio no es incompatible con la conveniencia de que los partidos políticos puedan llevar a las cámaras sus líderes más destacados y los principales intérpretes de sus programas. Ambas cosas se logran manteniendo la organización de distritos senatoriales y representativos y eligiendo un número alto de senadores y representantes por acumulación.*" 4 *Diario de la Convención Constituyente,* pág. 2591. (Énfasis suplido.)

En consideración a lo expuesto, en atención a la deferencia (⁹) que nos merecen los pronunciamientos de la Asamblea

sean de algún modo elegidos sobre una base geográfica. Cf. *Whitcomb* v. *Chavis,* 402 U.S. (1971); *Dusch* v. *Davis,* 387 U.S. 112 (1967)." (Énfasis suplido.) Publicación del Legajo de la Determinación Final de la Segunda Junta Constitucional de Revisión de Distritos Electorales, Senatoriales y Representativos, págs. 78–79. Traducción nuestra.

(⁹) En *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 741 (1976), enfatizamos la amplia facultad constitucional de la Asamblea Legislativa en asuntos de materia electoral según quedó configurada en la Sec. 4 del Art. VI de la Constitución.

Constituyente respecto a la elección de los candidatos por acumulación con la participación activa de los partidos políticos, y el interés legítimo y predominante que ello representa en nuestro sistema democrático de gobierno—sin infringir disposición constitucional alguna—*resolvemos que las reglas aprobadas por el Tribunal Electoral el 17 de junio de 1976 son válidas y constitucionales.*

Se dictará Sentencia al efecto.

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Martín concurren en el resultado sin opinión. El Juez Asociado Señor Rigau radicará un voto concurrente.

—O—

Opinión concurrente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 31 de agosto de 1976

Escribo estas líneas porque entiendo que es útil que se discutan y que, si posible, se aclaren algunos planteamientos que se hacen en este caso.

Es útil hacerlo, creo, para propiciar un mejor entendimiento de los problemas que el caso toca, tales como ¿para qué se celebran elecciones?, ¿cómo pueden los electores hacer efectiva su voluntad de endosar un programa político y de elegir un grupo de dirigentes para que formen gobierno? y otros que mencionaré.

Comencemos por aclarar lo del voto "independiente." Todo voto en Puerto Rico es independiente. Aquí el voto es libre y secreto. Cada elector entra solo a una caseta individual de votación con una papeleta impresa y un lápiz. Vota secretamente y nadie, salvo él, sabe a ciencia cierta cómo votó. Difícilmente hay un acto más secreto que pueda llevar a cabo un elector en Puerto Rico.

Para ser justos, y para que se entienda lo que sigue, es conveniente aclarar que el demandante utiliza el término "voto independiente" al referirse al voto que en toda elección emite

una minoría de electores, que es un voto fuera de partido, un voto personal, individualista.

El demandante afirma que la democracia puertorriqueña ha madurado a través de los años y argumenta que esa madurez la demuestra el uso del voto fuera de partido. La realidad es que la madurez de un electorado se demuestra cuando sabe elegir para su país entre un derrotero político y otro, cuando sabe elegir y reelegir a los gobiernos que le sirven bien y cuando sabe remover del poder a los gobiernos que le sirven mal. No es necesariamente correcta la ecuación que postula que a mayor número de votos fuera de partido mayor es la madurez de un electorado. En alguna circunstancia especialísima es posible que eso sea cierto pero en la generalidad de las veces el voto fuera de partido representa un mal síntoma en el cuerpo político de un país. Esto requiere explicación y paso a hacerlo. Ahora entramos en el meollo de la cuestión.

Es fácil comprender que la democracia contemporánea no puede operar en forma directa, votando en asamblea cada uno de nosotros sobre cada medida legislativa y sobre cada acción administrativa en particular. Así podía hacerse en las pequeñas comunidades de la Grecia clásica y en el antiguo *town meeting* de Nueva Inglaterra. Eso ya no es posible en las ciudades y en los estados modernos debido a su gran extensión, a su gran población y al número y enorme complejidad de sus problemas. Por eso la democracia moderna tiene que ser representativa.

El mero tamaño de las democracias modernas ha dictado que éstas sean representativas y que sean los partidos políticos los vehículos de la voluntad electoral y por ende de la democracia misma. En la campaña preeleccionaria dos o más grupos de hombres ofrecen al país un programa político y administrativo. En torno de ellos existe ya, o se organiza si no existe, un partido político. Los partidos adoptan los programas que sus líderes han ideado. Esto tiene que ser así necesariamente pues cientos de miles de electores, en el caso de

Puerto Rico, no pueden reunirse en asamblea para discutir y redactar un programa político. Esto generalmente se hace en el seno de un comité o de una asamblea que puede consistir de media docena o de un centenar de hombres. Claro, hay maneras de obtener los puntos de vista del electorado sobre problemas específicos y eso a veces se lleva a cabo. Pero fundamentalmente la función de los líderes es educar y dirigir y no meramente seguir los pasos de la muchedumbre.

El partido que vence en la elección llega al poder con un programa y un mandato electoral. El sistema es racional y, aunque con desigual eficacia, funciona.

Por el contrario, el voto fuera de partido no puede ofrecer al país un programa de gobierno porque sencillamente no lo tiene. El voto fuera de partido es con frecuencia un voto valetudinario. Es una manera de protestar pero no de organizar gobiernos. Debilita los partidos políticos ya que contribuye a enconar los conflictos internos, a perpetuar las disensiones de opinión y a dividir los partidos en facciones. Menoscaba el proceso democrático en general y en particular obstaculiza la función democrática de elegir y formar gobiernos.

A propósito de lo anterior, el Profesor Binkley ha escrito que el mayor tributo que puede hacerse a la moralidad política de los americanos de 1787 es reconocerle que a pesar de la amarga contienda que tuvo lugar sobre la ratificación de la Constitución de los Estados Unidos, dicha contienda no dejó grupos irreconciliables. [1] El Profesor y luego Presidente Woodrow Wilson también comentó sobre el particular. [2]

La experiencia ha demostrado que la proliferación de facciones y de partidos, al fragmentar en exceso la opinión pública, tiene un efecto desastroso sobre el sistema democrático. Lo confunde, lo paraliza y finalmente lo desprestigia. Cuando se cae en tal situación los beneficiarios de la misma

---

[1] Binkley, *American Political Parties*, 2da. ed. (1945), pág. 61.
[2] Wilson, *Congressional Government* (1885), pág. 2.

históricamente han sido los enemigos del propio sistema democrático. Se recordará que las carreras de Hitler y Mussolini debieron mucho a eso. En Francia, debido a la proliferación de partidos políticos, en un período de 67 años (1873-1940) hubo 99 gobiernos, con un promedio de vida de aproximadamente 8 meses cada uno. Cincuenta de esos gobiernos duraron solamente 6 meses o menos. (³)

Esa inestabilidad política fue una de las causas principales, sino la mayor, de la debilidad y del desastre de Francia en la Segunda Guerra Mundial. Por el contrario, obsérvese la fortaleza y la estabilidad de la democracia política en Inglaterra y en los Estados Unidos, en donde los partidos políticos nacionales son pocos—generalmente dos y a veces tres—y de larga vida. Los dos partidos políticos nacionales de Estados Unidos, el Demócrata y el Republicano, han sobrevivido más de treinta elecciones presidenciales.

La representación política, organizada a través de los partidos, es uno de los aspectos fundamentales del gobierno moderno y del sistema democrático en particular. Ya antes señalamos cómo las condiciones físicas de tamaño y de población, y la complejidad de los problemas públicos actuales ha hecho necesario acudir al sistema representativo. Un clásico en la materia expresa que "la democracia moderna es inconcebible salvo en términos de partidos políticos." (⁴) Uno de los más serios estudiosos de los procesos políticos contemporáneos considera "indispensable" el rol de los partidos políticos en la democracia moderna. (⁵) Otro autor escribe "El gobierno representativo es gobierno por partidos." (⁶) Puede decirse que si el Ejecutivo es la cabeza y el Legislativo el corazón, el

---

(³) Finer, *The Theory and Practice of Modern Government*, ed. revisada (1960), pág. 627.

(⁴) Schattschneider, *Party Government* (1942), pág. 1.

(⁵) Friedrich, *Constitutional Government and Democracy*, 4ta. ed. (1968), pág. 430.

(⁶) Finer, obra citada, pág. 237.

partido político es la sangre que los une, los comunica y les da vida. Sin un partido político fuerte y disciplinado la labor del Ejecutivo y del Legislativo se hace muy difícil y con frecuencia imposible o estéril. La soberanía popular la tiene el electorado, la hace efectiva a través de los partidos políticos, éstos al llegar al poder forman gobierno. El gobierno siempre recordará que la voluntad del pueblo es la fuente del poder público y que de allí emana su poder. La elección lo que ha hecho es legitimar el ejercicio de ese poder. Puede verse por qué se considera fundamental la función de los partidos políticos en el sistema democrático moderno.

Lo anterior no quiere decir, desde luego, que el interés del partido es lo principal y que todo otro interés debe supeditarse a aquél. Todo político y todo gobernante serio sabe que lo principal es el interés general del país, el bien común. Todos los demás intereses tienen una posición inferior al bien común. Lo que lo anterior reconoce es la realidad histórica y práctica de que una democracia saludable funciona a través de los partidos políticos y no a través de votos fuera de partido, sin programa, sin líderes y sin rumbo. No solo es esto una realidad histórica sino que es una cuestión fundamental pues el asunto va al corazón de la responsabilidad política, de la sustancia moral de todo gobierno. A un partido político que ha sido elevado al poder el electorado le puede pedir cuentas al fin de su mandato y reelegirlo o no; no así a un conglomerado de votos, fuera de partido, motivados cada uno por diferentes y personales razones.

Además la función del líder o de los líderes en cada partido es prácticamente indispensable. Alguien tiene que preocuparse a tarea completa por los problemas públicos, alguien tiene que estudiarlos, pensar sobre ellos y proponer remedios y soluciones. Formular esas propuestas, hacerlas llegar a la conciencia de la ciudadanía y convencer a los electores de sus bondades, es primordialmente la función del líder político. Si logra hacer eso entonces el cuerpo electoral le con-

ferirá la autoridad legítima que necesita para realizar su programa de gobierno.

Un número crecido de votos fuera de partido puede crear un cuerpo electoral amorfo, una masa sin cabeza. Lo que a toda masa le sobra son hombres-masa; lo que toda masa necesita son líderes que la eduquen y le señalen las posibles y las deseables direcciones de marcha. Como señala Ortega en uno de los libros más penetrantes del siglo 20, la masa no actúa por sí misma; necesita referir su vida a la instancia superior constituida por sus hombres excelentes. [7] Valga aclarar que Ortega al así expresarse no hacía distingos entre clases sociales, sino entre clases de hombres.

Se hace mucho énfasis en la Petición en que el voto fuera de partido y el voto por candidaturas constituye el derecho a la libre expresión. No hay duda de que eso constituye parte de la expresión del elector, como lo constituye cualquier cosa que haga, sea ésta legal o ilegal, prudente o imprudente, de buen o de mal gusto. Pero la realidad es que el derecho a la libre expresión está garantizado en Puerto Rico por la Sec. 4 del Art. II de nuestra Constitución y por la primera enmienda a la Constitución de los Estados Unidos.

El proceso electoral de Puerto Rico está organizado por nuestras leyes, en particular por el Código Electoral, Ley Núm. 1 de 13 de febrero de 1974, 16 L.P.R.A. sec. 2001 y ss., y tiene su base en las disposiciones de nuestra Constitución sobre la materia.

Son relevantes a esos efectos las siguientes disposiciones constitucionales: el Preámbulo, en el cual se expresa que nos organizamos políticamente sobre una base plenamente democrática y que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder político; la Sec. 1 del Art. I de la Constitución, en donde se expresa que el poder

_____

[7] Ortega y Gasset, *La Rebelión de las Masas*, 5ta. ed. (1935), pág. 185 y ss.

político del Estado emana del pueblo y que se ejercerá con arreglo a su voluntad; la Sec. 2 del Art. II en la cual se prescribe que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal; el Art. III donde se dispone sobre la elección de los miembros de la Asamblea Legislativa; el Art. IV donde se dispone sobre la elección del Gobernador; la Sec. 4 del Art. VI donde se dispone sobre la celebración de elecciones generales cada cuatro años; el Art. VIII que trata de los distritos senatoriales y representativos y la Sec. 6 del Art. IX que trata de los partidos políticos.

De manera que no es necesario recurrir a las disposiciones electorales de nuestra Constitución y de nuestras leyes para invocar o defender el derecho a la libre expresión pues dicho derecho está, como señalamos, expresamente garantizado por el Art. II de nuestra Constitución y por la primera enmienda de la Constitución de los Estados Unidos. Las disposiciones electorales, tanto de nuestra Constitución como de nuestras leyes, organizan nuestro sistema electoral. En otras palabras, los pueblos no incurren en el enorme gasto y en el trauma colectivo de celebrar elecciones para meramente garantizar la libre expresión; las elecciones se celebran para elegir gobiernos. El derecho a la libre expresión, esencialísimo como es, está garantizado por las otras dos disposiciones constitucionales antes mencionadas.

Desde luego, debe existir el derecho del elector de votar fuera de partido o de votar por candidaturas si así lo desea. Pero ese derecho, cuyo ejercicio constituye una anomalía en el proceso electoral y que con frecuencia representa un síntoma de mala salud en el cuerpo político, debe reconocerse como lo que es, pero creemos que no debe elevarse a categoría de virtud política.